## K. and E. Townsend *against* Bush.

A party to a negotiable instrument, who is divested of his interest, is a competent witness to prove it usurious in its creation.

Where the security given in pursuance of a usurious agreement was a bill drawn upon and accepted by *A.*, payable to and indorsed by *B.*, without notice of the usury; it was held that *B.*, who had paid the amount of the bill to an indorsee, could not recover against *A.* either in an action upon the bill, or in a count for money paid to the defendant's use.

THIS was an action of *assumpsit* against *Bush* as acceptor of a bill of exchange drawn by *Ebenezer* and *Atwater Townsend*, and payable to the plaintiffs or order. There was also a count for money paid, laid out and expended for the defendant's use. The cause was tried at *New-Haven*, *August* term 1814, before *Swift, Brainard* and *Baldwin*, Js. On the trial, the defendant admitted the drawing and acceptance of the bill, as stated in the declaration. His defence was usury under the following circumstances. *E.* and *A. Townsend* applied to *W. Leffingwell* in *New-York* for the loan of a sum of money. *Leffingwell* agreed to loan them the money at twelve *per cent.* interest, upon their giving him a bill of exchange for the amount, drawn by themselves on the defendant and accepted by him, payable to the plaintiffs *K.* and *E. Townsend*, and by them indorsed. These terms were complied with; the defendant at the time of accepting the bill, and the plaintiffs at the time of indorsing it, having no notice of the corrupt agreement. *Leffingwell* indorsed the bill to the *Derby Bank*, and there procured it to be discounted. When it became payable, the *Derby Bank* gave due notice to the several parties to the bill; and afterwards commenced a suit against the plaintiffs on their indorsement in the state of *New-York*, and by the judgment of the supreme court of that state recovered the amount of the bill with interest and costs, which the plaintiffs accordingly paid. The defendant accepted the bill for the honour of the drawers, having no effects of the drawers in his hands. To prove these facts, the defendant offered the individuals com-

*New-Haven*,
November,
1814.

Townsend
*v.*
Bush.

posing the firm of *E.* and *A. Townsend* as witnesses ; offering also, at the same time, to shew, that they had no interest in this suit, being discharged from all liability on the bill under an act of insolvency in the state of *New-York.* The plaintiffs objected to the admission of these witnesses, on the ground that having drawn the bill, and thereby given credit to it, they were incompetent to shew that it was invalid on account of usury ; and also on the ground that any proof of said corrupt agreement would be irrelevant on this trial. The court excluded the witnesses, and directed the jury to find a verdict for the plaintiffs ; which being accordingly done, the defendant moved for a new trial. This motion was reserved for the consideration of all the Judges.

*N. Smith* and *R. M. Sherman* in support of the motion. 1. The drawers of this bill, not having any interest in the cause, were competent witnesses. This point is to be considered here as *res integra ;* for though some judges may have expressed an opinion upon it, no case has come up which required a decision upon it. In *England,* its history begins with *Walton* v. *Shelley,* 1 *Term Rep.* 296. in 1786, and ends with *Jordaine* v. *Lashbrooke,* 7 *Term Rep.* 597. in 1798. In the first case, the decision was against the competency of the witness *generally.* The rule was then limited and qualified by various decisions at *nisi prius,* and by extrajudicial opinions *in banco.* *Bent* v. *Baker,* 3 *Term Rep.* 32, 36.* in 1789. *Charrington* v. *Milner, Peake's Ca.* 6. in 1790. *Humphrey* v. *Moxon, Peake's Ca.* 52. in 1791. In *Adams* v. *Lingard, Peake's Ca.* 117. in 1792, Lord *Kenyon* gave an explicit opinion that the indorser of a bill is a competent witness to invalidate it. He expressed the same opinion in *Rich* v. *Topping,* 1 *Esp.* 176. in 1794. Then came up *Jordaine* v. *Lashbrooke,* before the King's Bench, in which, after full consideration, the doctrine of *Walton* v. *Shelley* was wholly exploded. The question has not been heard of since in the *English* courts. In that country *Jordaine* v. *Lashbrooke* is now as good law as *Bent* v. *Baker.* But if we lay authorities out of the question, and resort to the principles of the common law, it is difficult to perceive why these witnesses

* In the same case, p. 34. Lord *Kenyon* is reported to have recognized the rule as limited to *negotiable* paper ; but in *Rich* v. *Topping,* 1 *Esp.* 177. he denies having used the words imputed to him.

should not have been admitted. They were not incompetent from want of understanding, or from disbelief in the obligation of an oath; they were not interested; and had not been convicted of any infamous crime. The common law knows of no other disqualification of a witness. The rule of the civil law, by which the decision in *Walton* v. *Shelley* was professedly governed, is applicable only to a *party*. It is every day's practice in public prosecutions to admit a *particeps criminis* as a witness. Further, in the present case, no turpitude is imputable to the witnesses offered. They were the *borrowers*, not the lenders of money at usurious interest. The law considers them as innocent; its object is to protect them; and it rather invites them to make complaint, than stops their mouths.

It has been attempted to support the rule which we oppose on the ground of *policy*; which requires, it is said, that no man, after having given credit to a bill by placing his name upon it, should be permitted to come into a court of justice, and impeach it. But a party who is sued upon a bill which he has given credit to by his signature, may impeach it by a plea of usury. Does not the policy in question bear as hard upon a party as upon a witness? In another point of view the ground of policy may be taken successfully. If the only witnesses to a usurious transaction may be excluded by getting their names upon the security, it will in effect repeal the statute. The policy of the law has hitherto been to suppress usury, not to encourage it.

2. The evidence offered was *relevant*, because it went to establish the defence of usury. The bill in question was given as a security for the payment of money lent whereby more than lawful interest was reserved.(*a*) If the bill was usurious in its inception, no subsequent transfer of it could make it valid. An indorsee for a valuable consideration, without notice of the usury, can maintain no action upon it. *Lowe* v. *Waller, Doug.* 736. Nor does it make any difference that in this case neither of the parties was a party to the usury. The transaction was really a loan of money by *Leffingwell* to *E.* and *A. Townsend,* secured to *Leffingwell* by this bill, drawn by *E.* and *A. Townsend,* accepted by the defendant, and indorsed by the plaintiffs. It was a part of the original corrupt agreement that such a bill, so drawn,

(*a*) Vide *Stat. tit.* 170. *s.* 2.

accepted and indorsed, should be procured and delivered to *Leffingwell* as security for the money lent. The drawers had no effects in the hands of the drawee, and owed nothing to the payees. There was no delivery of the bill, and of course it did not exist as a bill, until it came into the hands of *Leffingwell*. This being the substance of the transaction, the bill is void within the statute as much as though it were a promissory note given by *E.* and *A. Townsend* directly to *Leffingwell*. *Fields* v. *French*, 4 *Day's Ca.* 251. *Wilkie* v. *Roosevelt*, 3 *Johns. Ca.* 66.

This case is very distinguishable from a class of cases where the security was given upon a *new* consideration growing out of a transaction originally usurious ; as *Cuthbert* v. *Haley*, 8 *Term Rep.* 390., *Turner* v. *Hulme*, 4 *Esp.* 11., *Bearce* v. *Barstow*, 9 *Mass. Rep.* 45. [Some of the Judges intimated an opinion that *Turner* v. *Hulme* was not law.] It is not, however, necessary to controvert the authority of that case. The present case is within the qualification of Lord *Kenyon's* opinion ; as the form of this transaction was a colourable shift to evade the statute, *devised when the money was lent.*

As to the money count, it is only necessary to observe, that the sole ground of claim against the defendant arises from his acceptance of the bill. If *that* was void, he cannot be liable in any way.

*Staples* and *Denison*, contra. 1. *E.* and *A. Townsend* were inadmissible witnesses to prove usury in this bill. The case of *Walton* v. *Shelley* is the first reported case in which the question was discussed ; but the judges do not there consider themselves as establishing a *new* rule. They speak of it as at that time " a settled principle." The court, consisting of Lord *Mansfield* Ch. J. and *Willes, Ashhurst* and *Buller*, Js., were unanimous in the decision. The rule was afterwards repeatedly recognized, or admitted, by different judges, at *Nisi Prius. Charrington* v. *Milner, Humphrey* v. *Moxon, Adams* v. *Lingard*, in *Peake's Cases. Hart* v. *M'Intosh*, 1 *Esp.* 298. In the case last cited, Justice *Buller* declared explicitly, that he would adhere to the rule ; and Justice *Le Blanc*, then at the bar, said, that Chief Justice *Eyre* was of the same opinion. At length, *Jordaine* v. *Lashbrooke* was decided by the opinions of Lord *Kenyon,*

*Margin note:*

New-Haven,
November,
1814.

Townsend
*v.*
Bush.

Townsend
*v.*
Bush.

Ch. J. and *Grose* and *Lawrence,* Js. against the opinion of *Ashhurst,* J. The question, then, stands thus upon the authority of the judges in *Westminster-Hall :* against the competency of the witness, Lord *Mansfield,* Chief Justice *Eyre,* and *Willes, Ashhurst* and *Buller,* Js. ; for admitting the witness, the three judges who decided *Jordaine* v. *Lashbrooke.*

In this country, the decisions have been uniformly against the competency of the witness. The superior court of *Connecticut* have repeatedly decided thus on the circuits. In *Allen* v. *Holkins,* 1 *Day's Ca.* 17. the question was discussed before the supreme court of errors ; they recognized the doctrine of *Walton* v. *Shelley,* and decided the case on that ground. [*Smith,* J. I think I recollect Mr. *Ellsworth's* expressing the opinion stated by the reporter.] That the case might have been decided as it was on other grounds does not destroy its authority. In *Webb* v. *Danforth,* 1 *Day's Ca.* 301. before the same court, the doctrine was admitted. In *Massachusetts, New-York* and *Pennsylvania,* it is settled law. *Warren* v. *Merry,* 3 *Mass. Rep.* 27. *Parker* v. *Lovejoy,* 3 *Mass. Rep.* 565. *Churchill* v. *Suter,* 4 *Mass. Rep.* 156. *Widgery* v. *Munroe & al.* 6 *Mass. Rep.* 449. *Winton* v. *Saidler,* 3 *Johns. Ca.* 185. *Coleman* v. *Wise,* 2 *Johns. Rep.* 165. *Stille* v. *Lynch,* 2 *Dall.* 194. The great principle of public policy on which the rule is founded, ought to be preserved inviolate in a commercial state.

2. Admitting the competency of the witnesses, still the facts offered to be proved were irrelevant, as they constitute no defence to the action. All persons claiming under *Leffingwell,* however innocent or meritorious, are affected by the usury ; but these parties, from the relation in which one stands to the other, are not affected. The contract between the acceptor and the indorsers had no usury in it. A bill accepted in the hands of an innocent holder, although affected with usury in its creation, is good as between the acceptor and such holder. *Ord on Usury* 109. *Hussey* v. *Jacob, Holt* 328. S. C. 1 *Ld. Raym.* 87. S. C. *Com. Rep.* 6.

Further, the plaintiffs have been compelled to pay the amount of the bill by the decision of a competent tribunal upon the very point before the Court. If the plaintiffs were legally liable to the *Derby Bank,* it necessarily follows that the defendant is liable to the plaintiffs. The defendant being

the party ultimately liable, the money paid by the plaintiffs was money paid for his use.

*New-Haven*, November, 1814.

Townsend *v.* Bush.

TRUMBULL, J. The principal question in this case is, Whether *Ebenezer* and *Atwater Townsend*, the drawers of the bill in question, are admissible witnesses in an action by the plaintiffs as payees of the bill against the defendant as acceptor, to prove that it was executed on an usurious contract, and therefore is void in law.

The rule that no person can be permitted to give testimony to invalidate any instrument to which he has made himself a party by affixing his signature, in cases wherein he has no interest in the event of the suit on trial, was first adopted in the case of *Walton* v. *Shelley*, 1 *Durnford & East* 296., by Lord *Mansfield*, and the other judges of the King's Bench. He states that " the rule is founded in public policy ; that there is a sound reason for it ; because every man, who is a party to an instrument gives a credit to it ; that it is of consequence to mankind, that no person should hang out false colours to deceive them, by first affixing his signature to a paper, and then afterwards giving testimony to invalidate it ; that it is emphatically right in case of notes, because in consequence of different statutes, two very hard cases have arisen ; first, with respect to a gaming note, which, though in possession of a *bona fide* purchaser without notice, is void ; and in the case of usury, a note given for an usurious consideration, though in the hands of a fair indorsee, is equally void ; and therefore, whenever a man signs these instruments, he is always understood to say, that to his knowledge there is no legal objection to them whatever." He then quotes the maxim of the civil law, *nemo suam allegans turpitudinem est audiendus*, and applies it as conclusive on the present point. The other judges concurred, and established this as a general rule of law.

The *English* courts soon found the principle was laid down on too broad a scale, and narrowed it in its application, to negotiable instruments only. No new or additional reasons were ever adduced in its support. It was adhered to on the grounds stated by Lord *Mansfield*, and the authority of the decision in that case. But at length, the rule was exploded in the King's Bench, and such a witness determined to be

admissible, unless interested in the event of the suit on trial. See *Jordaine* v. *Lashbrooke, 7 Durnf. & East* 601.

As the decisions of the highest court and ablest judges at *Westminster-Hall* have been thus directly contradictory, and as their principle (notwithstanding the *dicta* of several of the judges in *Allen* v. *Holkins,* 1 *Day's* Cases in Error, p. 18. adopting the rule as sound law, and the decision in *Webb* v. *Danforth,* p. 301. denying its application as to facts subsequent to the execution of the instrument) has never till now come directly in question before the highest courts in this state, it is our duty to decide it according to the general rules and principles of law respecting admissibility of testimony ; and if the grounds and reasons in *Walton* v. *Shelley* are found to be fallacious, we cannot consider the case and its authority conclusive.

The first ground Lord *Mansfield* takes, is, that every person who signs an instrument, thereby gives it a credit, and can never be admitted to dispute its validity. Before we adopt this principle of universal exclusion and estoppel, we must enquire what credit each several party, by putting his signature upon a negotiable instrument, thereby gives to it, and what obligation he thereby incurs ; for each signer stands on a different ground.

The drawer of a bill or negotiable note, acknowledges himself indebted to the payee to the amount of the sum it contains, and engages to pay the damages, in case the bill shall be dishonoured, or the note uncollected, without the fault of the payee, or of those to whom it may be indorsed.

The indorser of a bill or note acknowledges his receipt of a valuable consideration, and contracts to pay the sum, in case it cannot be obtained of the drawer.

The acceptor acknowledges it to be duly drawn ; he is not admitted to deny the hand-writing of the drawer ; and he contracts to pay the sum according to its contents to the legal holder.

These are the rules and principles of common law, as adopted and sanctioned by the courts in this state.

The indorsee or holder of a negotiable security has nothing to do with the transaction between the original parties. See *Jordaine* v. *Lashbrooke.* Nor has the drawer or acceptor any thing more to do with the contracts between subsequent indorsers and indorsees. Each party is bound only

*New-Haven,*
November,
1814.

Townsend
*v.*
Bush.

so far as his own obligation extends, and cannot be precluded from denying any fact not acknowledged by his signature. All these contracts are separate and independent. No party by his signature warrants the validity of any contract but his own, or gives any farther credit to the security, or is interested in the event of any suit on the several contracts of other parties, whose names may appear on the instrument. He warrants nothing farther with respect to the validity of the draft, he hangs out no false colours, and is not estopped by his signature from testifying to any facts respecting the instrument, or any legal objections within his knowledge.

The only fundamental principle of the common law, applicable to the present question, is this, that no man can be a witness in his own cause ; and this rule hath ever been considered as applicable to every case in which he is a party, or is interested, and to no others. It was formerly holden as well in the *English* courts as our own, that an interest in the question was a sufficient ground for excluding a witness. It is now settled law in both, that an interest in the event of the suit is the only ground on which he can be rejected ; and, that a mere interest in the question does not affect his competency, but his credit with the jury only. But this distinction was not fully settled at the time the case of *Walton* v. *Shelley* was tried. Justice *Buller,* though he concurred in the principle that no man can invalidate his own security, relied much in his argument on the fact that the witness was interested in the question, because the question put to him was upon the validity of the notes he had indorsed ; although he clearly was not interested in the event of the suit on trial, as it must be uncertain whether he would ever be subjected to a subsequent action on the instrument, was already liable on his signature, and could never give the verdict in evidence in his favour.

The maxim of the civil law, that no man is to be heard who alleges his own turpitude or crime, was never by any court or judge, before Lord *Mansfield,* applied to the inadmissibility of a witness, but only to the rights of the parties in a suit or action. No suitor can support a claim, in which the ground or consideration is an unlawful act of his own ; nor can any defendant be heard on a defence, grounded on his own unlawful act. But an accomplice in a crime, a fraud, or any illegal transaction, was always an admissible

witness, unless immediately interested in the suit. **I may** further observe, that the term, " turpitude," can with no propriety be applied to an act, not *malum in se,* but only *malum prohibitum,* by force of some statute, making it penal in some particular country, or jurisdiction.

In *Jordaine* v. *Lashbrooke,* Lord *Kenyon* says, " The rule contended for is this, whatever fraud may have been committed, if the party to the fraud can get on the instrument the name of the person, who may be the only witness to the transaction, he will stand entrenched within the forms of law, and impose silence on that only witness, though he be a person of unimpeachable character, and not interested in the cause." This he denies to be law. *Grose,* Justice, says, " Let the plaintiff in this case resort to his indorser to recover back the consideration he gave for the bill."

Indeed, if a man sell and indorse a note executed by an infant, or feme covert, and void at common law, or void by statute as being usurious, unstamped or a forgery, I see no legal defence he can set up against an action of *assumpsit* by the indorser, for the money paid on a consideration which has wholly failed. For that is not an action on the bill or note, but rests entirely on the ground that the note is void in law. If such an action can be supported, there is no hardship in the case of an innocent purchaser ; he has his remedy. If in any case he is deprived of every legal remedy, no court can have a right, in compassion to the hardship of his situation, to assist him in evading the law by excluding such witnesses, or evidence, as is admissible in all other cases.

The hardship upon the innocent indorsee, which seems so strongly to have influenced the mind of Lord *Mansfield,* is indeed no more than this ;—by the statutes to which he refers, all bills or notes, where the consideration is money lent on usury or for gaming, are declared void to all intents and purposes whatever ; and consequently, the indorsee, whenever he brings his suit on the note or bill itself, against the drawer, promissor, or acceptor, must fail of a recovery in that action. But he is not without remedy for, if a fair and *bona fide* purchaser without notice, he may recover of the indorser on his indorsement. *Bowyer* v. *Brampton,* 2 *Stra.* 1155.

In the case of *Lowe* and others against *Waller, Doug.* 708. in which all the former cases are well considered, Lord

*Mansfield* himself says, " It is better that the law should be as it is with respect to bills and notes, than other securities ; because they are generally payable in a short time, so that the indorsee has an early opportunity of recurring to the indorser, if he cannot recover on the bill."

I am therefore of opinion that the witnesses offered are admissible, notwithstanding they have put their signature upon the bill.

But it is farther urged, that their testimony is irrelevant, and was properly rejected on that ground.

This depends entirely on the point, whether an innocent indorsee can recover in an action brought on an usurious bill, against the acceptor.   This was the sole point in the case of *Lowe* and others against *Waller ;* in which case, after taking time to consider, the court unanimously decided, that a bill of exchange given upon an usurious consideration is void, even in the hands of an indorsee for valuable consideration without notice of the usury.   And I hold this decision to be sound law, notwithstanding the extrajudicial opinions cited at the bar from *Holt,* Lord *Raymond* and *Comyns.*

On these grounds, I advise a new trial.

SMITH, J.   I concur in the opinion expressed by my brother *Trumbull ;* and would add, that the objection made by counsel that the testimony offered was irrelevant rested on the ground that the facts stated, and attempted to be proved, would not, if proved, constitute usury, because the usurious agreement was made between *Leffingwell* and *E.* and *A. Townsend,* who are not parties to this action, and neither the plaintiffs nor defendant had any knowledge of it.   The present case, so far as it respects this question, comes within the principle of the case of *Fields* and *French* v. *Gorham,* 4 *Day's Ca.* 251.   In that case, the court decided, that the defendant might avail himself of a corrupt agreement, of which he had no knowledge at the time of making it.   I then thought it necessary to presume an agency, by which the parties to the corrupt agreement might be supposed to act for the parties on the record.   But on attending farther to the expressions of the statute, I find them to apply rather to the *contract* than the *parties ;* and the only fact made necessary to avoid the contract is, that it be made for the payment of any principal, or money lent upon or for usury, whereupon

*New-Haven,*
*November,*
1814.

Townsend
*v.*
Bush.

or whereby there shall be reserved or taken more than at the rate of six dollars in the hundred(*a*).  In this case, there is no doubt of the fact that the acceptance and indorsement were made to secure the payment of money lent on usury ; and that more than at the rate of six *per cent.* was taken or reserved by a corrupt agreement.

SWIFT, J.  The question whether a party to a negotiable instrument, who is divested of his interest, is a competent witness to shew it void in its creation, now comes for the first time before this Court for decision.  We are unshackelled by any precedent, and are at liberty to decide it on principle.

In the case of *Walton* v. *Shelley* the rule was laid down, that no party who had signed an instrument should ever be permitted to give testimony to invalidate it.  Though the court and counsel speak of it as a well known rule, yet it can be found in no prior case.

Lord *Mansfield*, who had borrowed many valuable principles from the civil law and incorporated them with the common law, attempts to support his decision by what he says is a maxim of the civil law, *nemo allegans suam turpitudinem est audiendus ;* but there is no such rule to be found in the civil law as applicable to witnesses, and it is the daily practice in common law courts to admit witnesses to testify to facts which shew they have been parties to trespasses, frauds and crimes.

The rule, as laid down in the case of *Walton* v. *Shelley,* comprehends instruments not negotiable as well as those which are, and does not require the action to be brought on the instrument ; but if the consideration be antecedent notes given up, yet if the witness indorsed such notes, he is incompetent.  If this principle should be carried to its full extent, it would furnish an effectual shield for usury, gambling, fraud, and illegal contracts.  Let all who are concerned in the transaction, or who have knowledge of it, become parties to the writings made use of, and there will be neither danger nor possibility of detection.  So manifest was the mischief of this rule on so broad a basis, that the court of King's Bench, in the case of *Bent* v. *Baker,* in order to avoid it, were obliged to restrict it to negotiable securities, and in the

(*a*) *Tit.* 170. *s.* 2.

case of *Jordaine* v. *Lashbrooke* wholly to explode it. So that the case of *Walton* v. *Shelley* has been overruled, and is not now law in that country.

But as this rule, as far as it relates to negotiable instruments, has been adopted by highly respectable judicial tribunals in our sister states, it may be proper to examine it.

In the case of *Walton* v. *Shelley*, Lord *Mansfield* says, that whenever a man signs these instruments he is always understood to say that to his knowledge there is no legal objection. In the case of *Coleman* v. *Wise* and others in the state of *New-York*, the same principle is recognized. But there is not a precedent, or *dictum*, to warrant this position. When a man subscribes or indorses an instrument, he contracts certain legal liabilities, and he sets his name to it for no other purpose. He enters into no engagement that he will never testify that the instrument was obtained by fraud or duress ; or was given for a gambling or usurious consideration ; or that he will never make such plea. Every party to an instrument has a right by his plea to shew it was originally void. How then can it be pretended, that by signing it he is understood to say that to his knowledge there is no legal objection to it? If he contracts such obligation, the true principle would be not to permit him to make a plea or defence repugnant to it. To allow him to plead a fact which shews the instrument void in its creation, and then to refuse him the privilege of proving it, at least by one species of testimony, is a palpable absurdity. The iniquity really consists in the defence itself, and not in the mode of proof ; for certainly it would be as unjust for the defendant to make out his defence by a witness not a party to the instrument as by one that is a party.

In the case of *Churchill* v. *Suter*, 4 *Mass. Rep.* 156. Chief Justice *Parsons* says, " If the parties to the usury or the gambling, having received the fruits of their illegal contract, and having given a circulation to the note, can be admitted by their testimony to destroy it, beside the injury to a fair purchaser, the negotiation of paper will be greatly checked, to the no small injury of the public." This supposes that the indorser combines with the maker of the note to have it transferred to an innocent indorsee, and then by his testimony to avoid it for usury. All will acknowledge such conduct to be highly criminal. But suppose there was originally no

intent to defraud an innocent indorsee, and while the note is held by an indorsee having knowledge of the usury, for a usurious consideration, the indorser, by an act of bankruptcy, becomes discharged of his interest, it will be agreed then to be perfectly right for him to testify to the usury to avoid the note. Again, suppose a usurer has taken a most unreasonable advantage of the distress and misfortunes of another, and has compelled him to obtain security by the indorsement of a friend whom he cannot indemnify; he then puts the note in suit, and there is an indorser who has become disinterested who is knowing to the oppression and usury; it would clearly be his duty to come forward and testify to the usury for the purpose of destroying the note. Yet by the rule contended for, the indorser in both these cases would not be permitted to testify. Here then, for the purpose of protecting the possible case of the innocent indorsee, ample protection is furnished to the certain case of the usurer and oppressor.

Again, it is said, " that persons may be witnesses against their accomplices, because their testimony tends to prevent fraud and injustice, but in this case it tends to encourage it, by enabling parties to enjoy the fruits of it, and throw the consequence on an innocent indorsee." When accomplices are admitted to testify, the enquiry is not made whether it will or will not tend to encourage fraud; for if it should, it was never heard that this would be an objection to their testimony. The object is to punish crimes; and, as in many cases this cannot be done without the testimony of accomplices, the law admits them.

But to illustrate the subject; suppose a combination to defraud an innocent indorsee by a usurious note; the real usurer, to accomplish this plan, does not set his name to the note, and is rendered by releases disinterested; he would then be a competent witness to prove the usury; yet his testimony would tend to encourage fraud and injustice as much as if his name had been set to the note. This clearly shews that no such rule as that above mentioned exists.

It is further said, " No man shall be admitted to allege his own turpitude, when that allegation will tend to encourage fraud, or illegality. Nor shall the defendant in his defence allege his own wrong." This is no more than laying down the well-known maxim that no man shall take advantage of his own wrong; but this has always been applied to the

parties, and is now for the first time attempted to be applied to witnesses. Though this rule be generally true, yet a statute can controul its operation. Suppose a fraudulent combination to cheat an innocent indorsee by a usurious note, and a party to the fraud and the note is sued thereon ; he may plead the usury to avoid it. Suppose the plantiff replies the fraudulent combination, and that an indorsee is the only person who has knowledge of the fact. Unquestionably, the replication would be bad, and the note void. Here, then, the party is permitted to take advantage of all the turpitude, fraud, and wrong, which the above rule intended to exclude. Suppose an issue should be joined on the fraudulent combination ; a party to the fraud, if not a party to the note, might, on the principles contended for on the other side, be admitted as a witness ; he would then testify to his own fraud and turpitude. The truth is, the real question in all these cases is, whether the note was given for usury ; and this the party by force of statute may always plead, however base and shameful the transaction may be ; and may prove it by competent witnesses, however deeply they may have been concerned in it. It is in vain to talk about the turpitude of witnesses and the wrong of the defendant. *Ita lex scripta est.*

But public policy is the strong argument against the admission of parties to an instrument to invalidate it by their testimony. It is said, the makers and indorsers of negotiable notes may combine to defraud innocent indorsees, which would check and embarrass their negotiation, and prevent their circulation. It is true, such fraudulent combinations can be made, and the indorser of the note may testify to the usury on a suit against the maker, and the note may be avoided in the hands of an innocent holder. It is also true, that a similar fraud may be practised without the aid of an indorser or party to the note for a witness. Suppose two men wicked enough to contrive such a plan, they may make use of some friend expressly for the purpose of being a witness to the usury ; they may indorse the note to some person ignorant of it, and divide the spoils ; and on a suit by the indorsee, such friend may be called as a witness, and prove the usury. Here is precisely the same inconvenience and fraud as in the other case, and the same injury to the circulation of negotiable notes ; yet it cannot be denied

*New-Haven,*
November,
1814.

Townsend
*v.*
Bush.

that in this case the note must be set aside; for there is no legal objection to the witness, he has no interest, his name is not on the paper. When men are unprincipled enough to practise frauds of this description, I think it is much more probable that it will be done by the intervention of some friend whose name is not on the note than by an indorser. Of course, this rule would furnish very inadequate relief, if such a fraudulent scheme should seriously be adopted.

But if principles of public policy are to govern, they ought to extend to all cases where the injury is the same; and the rule ought to be, that no defendant should ever be admitted to plead usury, or any other fact, to avoid a negotiable instrument in the hands of an innocent holder. This would do complete and equal justice in all cases. But how unequal is this rule? It will protect the innocent holder in one case, but not in another under the same circumstances, and within the same reason; and where it protects the innocent holder, it furnishes the same protection to the usurer; for the rule in *Walton* v. *Shelley* makes no difference whether the holder knew of the usury or not; and in the case decided in *Massachusetts* the plantiff on the record was the actual usurer. A rule cannot be right which protects the very usurer the law intended to punish in one case, and in another subjects the innocent holder to a loss which it was the object of this rule to prevent.

But to decide on the policy of this law it is necessary to consider the object of the legislature in making it. It is manifest they intended in the most effectual manner to suppress usury. If they had admitted the principle, that usurious notes should be valid in the hands of innocent holders, they would have furnished a mode by which usury could have been practised with safety, and the law rendered nugatory. To shut the door against all such artifices, the law enacts, that usurious securities shall be absolutely void. It must have been well understood, that instances would occur where innocent indorsees might be prejudiced, and that parties to instruments, when not otherwise disqualified, might, by the general rules of evidence, be admitted to invalidate, by their testimony. It is not probable that the legislature contemplated precisely such a fraud as it is suggested may be practised: it must however have been known that notes might be set aside in the hands of innocent holders, which

would operate hardly, if not unjustly, in particular cases; but as a special provision in such cases would have defeated the statute, it must be understood that they intended to declare the notes void in the hands of innocent holders, considering the great object of suppressing usury of more importance than to promote the negotiation and circulation of notes by protecting innocent holders in the few cases where they might be affected. If there is any thing wrong in this business, any thing opposed to public policy, it is in the statute which makes void usurious notes in the hands of innocent holders; but this is a wrong which no court of law can remedy. It would be strange indeed for them to say, that a statute is not founded on principles of public policy, and then, though they cannot declare it void, yet they will refuse legal evidence to carry it into effect. This is an attempt by indirect means to repeal a statute. The legislature have decided on the policy of the measure; and it is the duty of courts to give it due operation.

But it has been said by Justice *Buller* : " It would be attended with consequences the most injurious to society if these securities might be cut down by the persons passing them; it is only for two men to conspire together to cheat all the world." *Peake's Ca.* 118. Chief Justice *Parsons* says : " For any man by contriving with another may take up money of him at usurious interest, and give him a negotiable note for security. The promisee may sell it for a valuable consideration, and when the indorsee attempts to recover the money, the promiser and indorser may (at least by releases) be witnesses for each other, and defeat the purchaser of his remedy, and quietly enjoy the money he has paid for the note." 4 *Mass. Rep.* 162.

It might be inferred from these observations, that innumerable frauds would be practised, if a party to a negotiable instrument could be a witness to impeach it, and that all confidence in negotiable paper would be destroyed; yet the truth is, no innocent holder of a note could ever sustain a loss, unless by the bankruptcy of his indorser, or the person from whom he received it; and he has nothing to do, to guard against a fraud, but to require the same ability in his indorser as prudent men ordinarily require when they give credit. It would also seem from the remarks above quoted, that an opinion was entertained that the parties to a usurious

*New-Haven,*
November,
1814.

'Townsend
*v.*
Bush.

Townsend
*v.*
Bush.

note could transfer it without liability to the vendee. Chief Justice *Parsons* says, that they may defeat the party of his remedy, and quietly enjoy the money. It is true, in a suit by the indorsee against the maker of the note, the indorser might be a witness, as he would testify against his interest; but in a suit by the innocent indorsee against the indorser, the testimony of the promiser would be of no avail, unless the indorsement was void on account of the usury contained in the note; and that the indorsement was void must have been the opinion of Chief Justice *Parsons,* otherwise he could not have said that the promiser might be a witness for the indorser, and thereby defeat the remedy of the purchaser. But it is an unquestionable principle, that though the note is void on account of the usury so that no action can be sustained upon it, yet if the promisee indorse it to a *bona fide* purchaser ignorant of the usury, he is liable on his indorsement; for this is a new contract not contaminated with usury, and it is binding on him, though the original note is void. If it should pass into the hands of an innocent purchaser without indorsement, if the seller conceal the usury, an action would lie for the fraud. The consequence then is, that men of property can never combine to practise a fraud of this description; for one or the other would always be responsible in some shape on the sale; and though they might defeat the purchaser of one remedy, they would be liable in some other mode; and consequently, could not enjoy very peaceably the fruits of their fraud, or very successfully cheat all the world. The apprehension, then, of danger from a fraudulent combination of the parties to a negotiable instrument, is founded on a mistaken view of the operation of the law respecting their liabilities.

But what are the frauds that can be practised in such cases? The only successful mode must be by the instrumentality of indorsers without ability to respond. Let us examine what frauds can be practised by the combination of a poor and a rich man. The poor man must always be the indorser. A man of property would never give his note to a bankrupt without consideration, on the risk that he will sell it, divide with him the spoils, and swear him clear of the debt. A poor man would hardly loan money or other property to a rich man on a usurious security, for the privilege of selling it, under an obligation to discharge the usurer by

*New-Haven,*
November,
1814.
Townsend
*v.*
Bush.

his testimony, and with a liability of going to gaol himself for another man's debt. A man of property would have little inducement, unless he received the full sum, to execute a note and run the risk that the promisee should swear him clear of it. The promisee could not be compelled to testify, as it would be against his interest; and he might die before the trial. A man of property runs a further risk; if he should practise such a fraud and avoid the note, yet he would be liable to an action in favour of the innocent indorsee whom he had cheated; and it would always be in the power of his coadjutor in the fraud to betray and subject him. So remote is the prospect of deriving any advantage from a fraud of this description, that I very much question whether an attempt ever has been, or ever will be, made to practise it. The calling on an indorser or other party to testify will always be an after calculation, and will probably occur only where there has been some failure or embarrassments.

What can be the injury to the circulation of negotiable paper to admit the parties to invalidate it by their testimony? It might prevent prudent men from taking the indorsements of bankrupts. This would not be very injurious to the commercial world. In the case of failure of the parties to the instrument after the indorsment, it might in some cases throw the loss upon a different party; but this would, in reality, be little more than the common risk of loss by failures, which every man runs in a commercial country where extensive credit is given.

I apprehend, then, there is no solidity in the argument drawn from considerations of public policy.

But let us consider what will be the effect not to admit a party to negotiable paper to invalidate it by his testimony. It will certainly furnish very ample protection to usurers. Conceal the usury from all who are not parties, and there can be no proof in an action founded on the obligation. The only method, then, must be a public or *qui tam* prosecution. The parties affected by the usury will usually be the witnesses, and can get no redress. They can rarely calculate on such advantages from *qui tam* prosecutions as to realize any thing more than a gratification of revenge; and if a usurer has nothing more to restrain him than such prosecutions, the statute against usury will be of little consequence.

In practice, it will be found, that this rule has much oftener protected the usurer than innocent indorsees. In the case of *Walton* v. *Shelley, Sutton* by whose assignees the action was brought, must have known the usury. The bond was executed in consideration of notes given up. If he had been ignorant of the usury, the bond would have been good. In the case of *Churchill* v. *Suter,* the usurer was the plaintiff. In both cases, the usurers were protected.

In the case before us, the rule in *Walton* v. *Shelley* would have screened the party charged with the usury, and would have subjected the defendants to pay ; but the rule I contend for would have visited the consequences of the usury upon the usurer. In the suit by *Derby Bank* against the plaintiffs in *New-York,* if *E.* and *A. Townsend* had not been excluded from testifying on the ground that they were parties to the bill, then the plaintiffs (admitting the usury existed as conceded by the pleadings) would have made good their defence, and the *Derby Bank* would have had a complete remedy against their indorser, who is stated to be the usurer. But the application of that rule has effectually protected him.

In this case, there would have been no difficulty, had it not been for the failure of *E.* and *A. Townsend.* As the plaintiffs indorsed and the defendants accepted as sureties for them, though their indorsement and acceptance were void as they were made to secure the usury to *Leffingwell ;* yet if they had been subjected to pay, they could clearly have recovered of *E.* and *A. Townsend* for money paid by them as sureties ; for in the implied promise to indemnify there was no usury, as they were unacquainted with the nature of the transaction between *Leffingwell* and them. But now, by their failure, they have lost their remedy ; the application of different rules by the courts in the state of *New-York* and *Connecticut* has subjected the plaintiffs to suffer a loss by the bankruptcy of *E.* and *A. Townsend,* which the defendant must have sustained, if the bill had not been usurious. This loss, however, is owing to the bankruptcy of *E.* and *A. Townsend,* and not to any preconcerted plan to cheat them.

As to the question respecting the usury ; it appears from the facts stated, that on a contract between *Leffingwell* and *E.* and *A. Townsend,* they were to draw a bill on *Bush,* in favour of *E.* and *A. Townsend,* to be accepted and indorsed ; and on this security the money was to be loaned at twelve

*per cent.* Here the drawing, accepting and indorsing were to secure the usury to *Leffingwell;* and though the acceptors and indorsers were ignorant of the usury, yet this does not prevent the transaction from being usurious; for it was manifestly a contrivance to evade the statute, and if allowed of, usury might be practised with impunity.

New-Haven,
November,
1814.

Townsend
*v.*
Bush.

The other Judges concurred.

New trial to be granted.

