CRISMAN ET AL. V. DORSEY.

1. ATTACHMENT OF CHATTELS — REQUISITES OF A VALID LEVY. — To constitute a valid levy, under the statute, of a writ of attachment on personal property capable of manual delivery, the officer holding the writ must take it into his *custody;* which means that he must take it into his care and possession. If the articles are bulky and difficult of removal it may not be necessary to remove them, but the officer must do whatever is necessary to reduce the property to his possession and subject to his dominion and control.

2. ATTACHMENT LIEN — PROPERTY MUST BE IN CUSTODIA LEGIS — NOTICE OF LEVY.— An attachment lien against chattel property capable of manual delivery can only be acquired by a valid levy thereon of the attachment writ. Merely going to the place where the property is situated, indorsing a levy upon the writ, and notifying the defendant that the property has been attached, is insufficient. Further acts, as the removal of the property, placing a man in charge of it, or some equivalent act by means of which it is placed under the officer's control, is necessary to put it *in custodia legis,* without which no lien is created; and the attempted levy is void as against one to whom the property is subsequently delivered in pursuance of a previous contract, although he had notice of the attempted levy.

## Appeal from Superior Court of Denver.

ON September 1, 1884, suit was begun by Emma P. Vonach in a justice's court of Arapahoe county to recover from John Crisman and J. M. Tanner the sum of $145. On September 4th a writ of attachment was issued in that case and delivered to the appellee, Samuel C. Dorsey, for execution. The formal evidence of the execution of the writ is contained in the return indorsed thereon in the following language: "Executed the within writ September 4, 1884, by levying upon and taking into my possession four stacks of wheat; also by leaving a copy of this writ with John Crisman and J. M. Tanner, defendants herein. [Signed] SAMUEL C. DORSEY, Constable."

On September 27th judgment was entered in favor of the plaintiff in that action for the sum of $155 and costs.

After the issuance and service of the attachment writ as above stated, John Crisman, one of the defendants therein named, delivered the property, or some part of it, to the appellant, Obed Crisman. After the rendition of judgment by the justice, appellee, Samuel C. Dorsey, demanded the delivery of the property by the appellants, and upon their refusal to deliver the same instituted an action in justice's court to recover the value thereof. In that suit judgment was rendered in favor of appellants for costs, and thereupon an appeal was perfected to the superior court of Denver. A trial was had in that court May 18, 1885, which resulted in a judgment in favor of appellee for the sum of $198 and costs, from which judgment this appeal was taken.

Upon the trial the plaintiff introduced in evidence the summons, affidavit and attachment bond and the writ of attachment, together with the returns indorsed upon the process. To further maintain the issues, oral testimony was introduced by plaintiff as to the manner of the execution of the writ by him and the circumstances under which the property subsequently came to the possession of the appellants. Appellee stated in this behalf that when the writ was placed in his hands he went to the farm on which Crisman and Tanner, the defendants, lived, and levied on four stacks of wheat which were on the land occupied by them. He further states that a copy of the writ was served upon the defendants, and that he told them that he would levy on the stacks of wheat, and that his instructions were to leave them on the ground; that he was instructed to make the levy and notify the defendants. He also stated that he did not caution them about the property; that Crisman said he was going to thresh; that he thought he told Crisman he could not be there to keep him from threshing. "*Question.* What, if any, permission or favor did you extend to them, the defendants, in regard to the control of the

property? *Answer.* None; I did not say anything about the control of the property. I notified them. *Q.* Did you ever see this grain, Mr. Dorsey? *A.* No, sir."

Appellee further states that he made a demand for the wheat, but that appellants denied having any wheat belonging to Crisman and Tanner.

John Crisman, one of the defendants in the original case, was sworn as a witness in behalf of plaintiff, and stated that he sold the wheat that Dorsey had levied upon; that the principal part of it was sold to defendants; that of the wheat which was attached he delivered about three hundred and thirty bushels, which was of the value of sixty cents per bushel. On cross-examination he testified that but two stacks were levied upon under the writ; that at the time the levy was made the papers were served, and he told appellee that the threshing-machine was to be there the next day, and that he calculated to thresh; that Dorsey said he would serve the papers, but that he had told the plaintiff in the case that he would not stay and watch the stacks of wheat unless he was paid handsomely for it. The witness further said that nobody stayed to watch the wheat after levy was made; that it remained in his charge and that of Tanner; that when he sold the wheat to his father, Obed Crisman, he told him nothing about the levy.

Obed Crisman, one of the appellants, testified in behalf of the plaintiff, in substance, that he got wheat, but was very much mixed up, so that he did not know when the wheat was coming in, or exactly whose wheat it was; that it was coming in from the Platte Land Company, which company owned the land; that there were three teams hauling, and it was stated to him that the wheat was from section No. 35, but until he settled he didn't know exactly how the wheat stood. When the agent of the land company came down he told him that the wheat coming from such teams was his wheat — the rent wheat

of the farm. When the other wheat came, John Crisman had a part.

"*Question.* Do you recollect being called upon by Mrs. Vonach? *Answer.* Yes, sir. *Q.* Did you have any conversation with her? *A.* Some; yes, sir. Had a talk with her. *Q.* Did she talk about this wheat being attached? *A.* Mrs. Vonach came to see me three times. I believe she did not make her business known at all the first two trips. I did not know her. She was simply inquiring about John Crisman, where he lived, etc. On the first two trips she was there, there was a conversation in regard to when John would be in, and where he lived. *Q.* Did she ask you about delivering the wheat? *A.* No, sir; neither of the first trips. The third time she came in she made her business known. *Q.* What did she say then about an attachment? *A.* She first said that John Crisman was owing her for rent on a farm called the 'Hughes Farm,' that he farmed two years before. I told her I knew very well about that crop, for I backed him up — furnished teams and seed. I did not know that he owed anything on it, but if he did she better see John Crisman. Before she left she told me either that she had levied or was going to levy on it. I would not be positive, but it is my impression she said she had levied on some Crisman wheat and Tanner's. *Q.* Do you recollect what you said to her in reply? *A.* I told her it was my wheat. I had furnished the seed, and furnished the money to carry on the farm, and they were indebted to me under the promise that I was to have the wheat when milled. *Q.* Was this before or after the delivery of the share of John Crisman? *A.* This talk was on the same day. She either said she had levied or she was going to. *Q.* It was before the wheat was delivered? *A.* No; there was some wheat delivered. This English Company's team was hauling in wheat, and there were two loads. *Q.* The share of John Crisman was delivered

afterwards, was it not? *A.* Yes; his was delivered afterwards."

It further appeared from the testimony of this witness that he held a paper signed by John Crisman, of which the following is a copy: "($500.)   Denver, April 1, 1884. Five months after date I promise to pay to O. Crisman $500 in wheat and oats, value received.   [Signed] JOHN CRISMAN."   He also testified that he furnished the money to buy the farming implements and the seed; that he paid the expenses of cutting and threshing the wheat; and that he realized from the wheat above such expenses from $70 to $80.

When the plaintiff rested his case the defendants moved for judgment. The motion was denied, and thereupon the cause was submitted to the court.

Messrs. BROWNE & PUTNAM, for appellants.

Mr. F. A. WILLIAMS, for appellee.

PATTISON, C.   The sole question presented by this record is whether the writ of attachment issued in the action brought by Emma P. Vonach against John Crisman and J. M. Tanner was sufficiently executed.   To sustain the finding and judgment of the trial court the proposition must be established that, by virtue of the attachment writ and his proceeding under it, appellee was vested with a special property in the wheat levied upon, and that it was charged with a valid and subsisting lien, subject to which the appellants acquired possession of the property.   The determination of this question necessarily involves the examination and consideration of the law relating to the execution of attachment process.

The office of a writ of attachment is clearly and well defined.   "At common law, as well as under our statutes, it is a proceeding to create and enforce a lien.   It is a remedy for the collection of an ordinary debt, by preliminary levy upon the property of a debtor to conserve

it for eventual execution after lien shall have been perfected by judgment." To create the lien, it is manifestly essential that there should be not only a proceeding regularly instituted, but that the process itself should be so. executed as to constitute a valid attachment. By the process which was issued to the appellee, and under the authority conferred by which he was acting, he was required to attach so much of the personal estate of the defendant therein named as should be of value sufficient to satisfy the amount of the debt and costs. He was further required to secure the estate so attached, or to so provide that the same might be liable to further proceedings thereupon, according to law, etc. This was the mandate of the process, from which the authority of the appellee in the premises was derived. Section 2002, General Statutes, relating to attachments issued out of justices' courts, provides that "the writ of attachment shall be addressed to any constable of the proper county, and shall require him to attach the goods, chattels, stocks, or interests in stocks, rights, credits, moneys and effects of the defendant in his county, not exempt by law from execution, or so much thereof as will satisfy the plaintiff's claim, to be stated in the affidavit, and the probable costs of the action."

Section 2005 provides that "the writ of attachment shall be directed to the constable of the county in which the suit is commenced, and shall require such constable to serve a copy of the writ upon the defendant, and to attach and safely keep so much of the personal property of the defendant within his county which is liable to be taken in execution as may be sufficient to satisfy the plaintiff's demand (the amount of which shall be stated in the writ in conformity with the affidavit for the attachment), unless the defendant deposits with the justice the sum of money mentioned in the writ, or give the plaintiff security, to be approved by the justice by the undertaking of at least two sufficient sureties, in an

amount sufficient to satisfy such demand, besides costs, or in an amount equal to the value of the property which has been attached." Such are the requirements of the writ itself, and the provisions of the statute under which it is issued.

The requirements of the process, and the duty imposed upon appellee in the premises, being defined, the inquiry which naturally arises is, How are these requirements to be met by the officer, and how is this duty to be discharged? In the determination of this question attention is called—*First*, to the provisions of the statute relating to the execution of attachment process; *second*, the elementary principles of law bearing upon the question contained in the text-books; and *third*, the decisions of the courts.

Section 2007 of the General Statutes provides that "the constable to whom the writ is delivered shall execute the same without delay, and, if the deposit be not made or the undertaking given as hereinbefore provided, then as follows: (1) Personal property capable of manual delivery shall be attached by taking the same into the custody of the constable. (2) Debts, credits and other things in action which are not capable of manual delivery shall be attached by leaving with the person owing such debts, *  *  *  or with his agent, a copy of the writ of attachment," etc.

The meaning of the language of the section quoted is clear and unmistakable. Under it, it is the duty of the officer to execute the writ of attachment by taking the personal property " capable of manual delivery " into his custody. The nature of the property required to be taken into custody is clearly disclosed by the language of the section. All personal property capable of manual delivery must be taken into custody; that is, into the care and possession of the officer. Manifestly, within the meaning of this section, all chattels, all tangible personal property, is capable of manual delivery. The kind of property which is not capable of manual delivery

within the meaning of the statute is as described in the second subdivision of the section. Such property consists of debts, credits and other things in action. In other words, it is choses in action, as distinguished from tangible property or chattels.

Under the section cited, it is clear that the writ of attachment can only be executed as to personal property which is capable of manual delivery by taking it into custody, and that within the meaning of the statute all personal property subject to attachment, except choses or things in action, is capable of manual delivery. The fact that the property to be attached consists of bulky articles, difficult of removal, does not excuse the failure of the officer to take possession. To do this it may not be necessary to remove the property from the place in which it is found. Nevertheless it is incumbent upon him to do whatever may be necessary to take the property into custody. After the levy of the process the possession of the property should be his. It should be subject to his dominion and control. His possession must be exclusive. His dominion cannot be shared with the defendant. The effect of the levy must be to place the property *in custodia legis*. It cannot be held adversely to the court or to the officer. The officer must be clothed with the *indicia* of ownership. The effect of the steps taken by him must be to charge the property with a lien, and create a special property therein, which will enable him at all times to protect and maintain his possession, and hold the property subject to the order of the court until the attachment shall be dissolved. The provisions of the statute cited will admit of no other construction.

2. Attention is now called to the elementary principles of law relating to the levy of attachment process as laid down in the text-books. Drake on Attachment, section 256, declares that "an officer in attaching personalty must actually reduce it to possession, so far as under the circumstances can be done." He further says that the

custody should be such "as will enable the officer to re-
tain and assert his power and control over the property,
so that it cannot probably be withdrawn or taken by an-
other without his knowing it." At section 290 he says
that "the writ of attachment in its action upon tangible
property has no value or efficacy, except as a means of
keeping the property until under the final process in the
case it can be sold, or be made available to satisfy the
plaintiff's demand. Hence the first duty of the attaching
officer is to retain possession of the property." See, also,
Wade, Attachm. §§ 164–166.

Waples on Attachment, page 288, says: "If under the
operation and authorization of a statute the sheriff may
leave attached property in the hands of defendant, it is
always only as agent that the latter holds. He cannot,
under any statute, have legal possession independent of
the sheriff and of the court, after attachment, without
destruction of the entire effect of the act of seizing under
the writ. He must hold under the sheriff, be amenable
to the orders of the sheriff, so that the latter may always
be enabled to obey the court when mandates are issued
concerning the property. There cannot be even con-
structive custody, unless the sheriff or other officer im-
mediately under the court has actual control so as to be
really the legal custodian." See, also, Ror. Jud. Sales,
§§ 1002, 1003.

In the light of these elementary principles, the evi-
dence fails to disclose the requisites of a valid levy. Ap-
pellee states that upon the day the writ of attachment
was issued to him he went to the farm occupied by de-
fendants and served copies of the writ upon them, and
notified them that he would levy upon the stacks of
wheat. It appears that he had been expressly instructed
by the plaintiff in the suit to levy the attachment and
leave the property where he found it. No one was pres-
ent when the levy was made, except the defendants
themselves. He did not take the property into custody.

He exercised no dominion over it. He did not forbid the defendants from interfering with it. He placed no one in charge of it. The defendants declared it to be their intention to thresh the wheat on the following day, but nothing was done by appellee to prevent them from doing so. The property was left upon the farm occupied by defendants, and remained in their actual possession and under their control. There was nothing to indicate that the property had passed from the possession of its owners. The levy was merely formal — a " pen and ink " levy. The property was never in the custody of the law.

3. If there was no valid attachment of the property in question, when tested by the requirements of the statute and the elementary principles of the law, it remains to be seen whether, upon an examination of the authorities, any case can be found upon which to predicate the sufficiency of the execution of the writ, either as against the original defendants therein or the appellants. In the consideration of this branch of the case the contention of the appellee that appellants had notice of the attachment may be discussed. Before citing the authorities, a review of the evidence bearing upon the relation of the appellant Crisman to the property may aid in arriving at a final conclusion. It appears that John Crisman, one of the defendants in the original action, was the son of the appellant Obed Crisman; that Obed Crisman claimed that the wheat in question belonged to him. The wheat which came to his possession was threshed from two of the stacks upon which the levy was attempted to be made. What became of the Tanner wheat does not appear. The recovery was confined to the Crisman wheat. It appeared that of that there were three hundred and thirty bushels, of the value of sixty cents per bushel; the judgment was for $198. From the undisputed evidence of this appellant it appears that under an arrangement with his son he had furnished the seed

and the farming implements, and had paid the expenses of carrying on the farm, and the expense of threshing the wheat, with the agreement and understanding that he was to have the wheat when it was milled. Under this agreement it is manifest that as between him and his son he was entitled to the possession of the wheat. He had performed the contract on his part, and the delivery of the wheat by the son was made pursuant to the agreement. It is true that the written evidence of the contract is contained in the written memorandum, a copy of which is set forth in the foregoing statement of facts. This memorandum, however, is signed by the son alone, and cannot be considered as the only evidence of the arrangement. It is clear that the wheat in controversy was raised from the seed furnished by appellant; that the expenses of sowing, harvesting and threshing had been paid by him; and that it was the very wheat which was to be delivered to him in consideration of the money advanced by him. Whatever was the nature of the contract, therefore, between the father and son, whether he is considered as interested in the raising of the crop, or a purchaser of the wheat, it is clear that at the time of the attempted levy nothing remained to be done to consummate the contract except the delivery of the wheat.

Manifestly, therefore, as between Obed Crisman and the attaching creditor, the party first acquiring actual possession of the property could hold it as against the other. If, then, the property was actually in the custody of the law, notwithstanding the failure of the officer to comply with the mandate of the writ, and if the appellants had notice thereof when the property came to their possession, then the judgment should be affirmed. But if, on the contrary, the property by virtue of the proceedings was not actually in the custody of the law, if there was not in fact a valid attachment, then the information given by the attaching creditor that she intended

or had in fact levied upon the wheat, could not have affected the rights of appellant, and he acquired the property free from incumbrance. Mere notice that a writ of attachment had issued, or of the pendency of the action, could not be sufficient; for the reason that it is well settled that no lien is created by the issuance of the attachment writ; that such lien can only be created by a valid levy. It is not the writ, but the levy of the writ by the actual seizure of the property, which constitutes the attachment.

Attention is now called to the authorities bearing upon this question. The nature of the inquiry in this connection is clearly stated in Waples on Attachment, page 289: "If, upon his own responsibility, the sheriff leaves property with defendant which is susceptible of actual manipulation and removal, * * * taking his receipt therefor, such officer would be answerable to the attachment plaintiff for thus destroying the lien, should it thus be destroyed. Whether or not it would be depends entirely upon the legal capacity in which the defendant holds possession. Is his arrangement such that he cannot sell his property free from incumbrance; cannot deliver it, if sold; cannot administer it except under surveillance of the sheriff? If so, he cannot set up that the lien is gone; and, if third persons have knowledge of such arrangement, they are also estopped." In this case there was no arrangement with the attachment debtors that they should hold under appellee. On the contrary, it expressly appears that they were not disturbed in their possession at all. The property continued in their possession, and was held adversely to the court. There was no valid attachment. See Wade, Attach. §§ 166, 270; *Crawford v. Newell*, 23 Iowa, 453; *Adler v. Roth*, 2 McCrary, 445; *Thompson v. Baker*, 74 Me. 48; *Bagley v. White*, 4 Pick. 395; *Weston v. Dorr*, 25 Me. 176.

The principal authority relied upon by appellee is *Richardson v. Rardin*, 88 Ill. 124. In that case it was

held that "where a constable in actual view of the prop-
erty levied upon a large crib of corn, indorsing the levy
on the execution, the defendant in execution being pres-
ent getting a load of corn, and where the constable noti-
fied him of the levy, and forbade his further interfering
with the corn, and at the time nailed boards across the
crib to secure the corn, and then gave notice in the hear-
ing of several persons near that he had levied on the
corn, and that it must not be disturbed, that as his act,
but for the writ, would have been a trespass, the levy
was good, and sufficient publicity was given of it." The
facts upon which the foregoing decision was based were
in no sense parallel with the facts of the case at bar. In
that case, in the presence of the defendant named in the
writ and of the claimant of the property, the officer not
only made a formal levy, but he reduced the property to
actual possession and exercised dominion and control
over it. He warned the defendant and the claimant that
they must not interfere with the corn. He nailed up the
crib in which it was kept. The subsequent purchaser
not only had notice of the formal levy, but to obtain
possession of the corn he was compelled to remove the
obstacles placed by the officer himself to secure its pos-
session. In *Havely v. Lowry*, 30 Ill. 446, it was held
that, if a delivery bond is not executed, the officer must,
to affect the rights of third persons, take the property
into his possession. See *Logsdon v. Spivey*, 54 Ill. 104;
*Davidson v. Waldron*, 31 Ill. 120.

In *Rix v. Silknitter*, 57 Iowa, 262, it was held, in
effect, that a levy under which the officer did not have
actual control of the personal property levied upon with
power of removal was incomplete as to the subsequent
chattel mortgagee having notice of the attempted levy.

In *Shephard v. Butterfield*, 4 Cush. 425, it is held that
an attachment is abandoned where the officer gives no-
tice of the attachment, but takes no actual charge of the
goods, either personally or by keeper, even as against a

subsequent mortgagee having notice of the attempted levy. See, also, *Nichols v. Patten*, 18 Me. 231; *Gower v. Stevens*, 19 Me. 92; *Flanagan v. Wood*, 33 Vt. 332; *Bryant v. Osgood*, 52 N. H. 182.

In *Taintor v. Williams*, 7 Conn. 271, it is held that "it is essential to the preservation of the lien created by the attachment of personal property that possession be taken and held, and when this is relinquished there is a termination of the lien, and the general owner is remitted to his property unincumbered. The reason of this is that possession of personal property is the only *indicium* of ownership, and the suffering of a debtor after service of an attachment to retain possession is *prima facie* proof that the attachment is fraudulent in respect of creditors. Personal property not in the actual possession of any one is in the constructive possession of the general owner."

In *Mills v. Camp*, 14 Conn. 219, it is held that the rule requiring transfer of actual possession and actual removal of personal property in order to render the sale or attachment valid as against creditors is a rule of policy, and not of evidence, and therefore proof of the honesty of the transaction will not be sufficient to remove the legal effect of a failure to remove the property attached.

After this examination of the statute, the text-books and the authorities, it is clear that the judgment of the court below was against the law. To hold otherwise would, in effect, abrogate a positive legislative enactment, and warrant the substitution of a mere "paper levy" for the actual seizure and continued possession of the property.

An attachment suit is in its nature a proceeding *in rem*. The property sought to be attached constitutes the *res* of the action. To give the court jurisdiction over it the subject of the attachment must be in the custody of the law. This is the office of the writ. If the property

is not taken into custody, the process fails to perform its office.    The lien sought to be created by the proceeding is dependent upon seizure and possession. If these requisites of a valid levy are absent, then the attachment is void.

If this conclusion is correct, then it logically follows that appellee had no lien upon the property in question,— no special property upon which a right of action against appellants could be predicated.    The information given by Mrs. Vonach to Obed Crisman could not render valid that which was void.    Notice to him could not supply appellee's omission of the steps necessary to the effective execution of the writ.    The judgment should be reversed.

REED and RICHMOND, CC., concur.

PER CURIAM.    For the reasons stated in the foregoing opinion the judgment is reversed.

*Reversed.*